IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ELIZABETH CASTANEDA, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. _____ |
| | § | |
| VS. | § | |
| | § | JURY DEMANDED |
| CITY OF CARROLLTON, | § | |
| | § | |
| AND | § | |
| | § | |
| CARROLLTON POLICE DETECTIVE | § | |
| JEREMY CHEVALLIER, | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

Plaintiff ELIZABETH CASTANEDA ("**Plaintiff**") complains of Defendants:

1.      The CITY OF CARROLLTON ("**City of Carrollton**"); and

2.      CITY OF CARROLLTON POLICE OFFICER JEREMY CHEVALLIER

("**Detective Chevallier**"), as follows:

### Introduction

The "general right of an individual to be let alone…is like the right to not be assaulted or beaten, the right not to be imprisoned, the right not to be maliciously prosecuted, the right not to be defamed."

> -   Louis D. Brandeis and Samuel D. Warren, *The Right to Privacy*, 4 Harv. Law Rev. 193, 205 (1890)

"Unlike the United States Constitution, the Texas Constitution twice expressly guarantees the right to bring reputational torts."

> -   *Neely v. Wilson*, 418 S.W.3d 52. 60 (Tex. 2013)

**ORIGINAL COMPLAINT – Page 1**

**Parties**

3.      Plaintiff is a lifelong resident of the City of Carrollton, Texas.

4.      The City of Carrollton is a municipality of the State of Texas located in Dallas County, Texas. It may be served with civil process in this action by serving its Mayor Steve Babick at 1945 E. Jackson Road, Carrollton, Texas 75006 or wherever he may be found and/or by United States Certified Mail, postage prepaid, return receipt requested. Alternatively, service of civil process may be served on the City Secretary Chloe Swatzki, at 1945 E. Jackson Road, Carrollton, Texas 75006 or wherever she may be found and/or by United States Certified Mail, postage prepaid, return receipt requested. Alternatively, service of civil process may be served on the City Treasurer, Claudia Gallegos, at 1945 E. Jackson Road, Carrollton, Texas 75006 or wherever she may be found and/or by United States Certified Mail, postage prepaid, return receipt requested.

5.      Detective Chevallier is a resident and citizen of the City of Carrollton, Texas, and an officer or detective in the City of Carrollton Police Department ("**Carrollton Police Department**"). He may be served with civil process in this action by personally serving Meredith Ladd, Carrollton City Attorney, 1945 E. Jackson Road, Carrollton, Texas 75006[1], and/or by United States Certified Mail, postage prepaid, return receipt requested.

**Jurisdiction and Venue**

6.      The Court has jurisdiction over this civil action arising under 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. § 1367(a).

7.      Venue in this District is proper pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

---

[1] Ms. Ladd directed that Chevallier should/could be served through her.

**ORIGINAL COMPLAINT – Page 2**

**Facts**

**A.    Plaintiff**

8.    Plaintiff is a lifelong resident of the City of Carrollton.

9.    She is active in the community and civic affairs.  She is sometimes involved in assisting political candidates in city and county elections.

10.    She loves the City of Carrollton and is devoted to the promotion of its businesses and history.  She has for many years sat on the city's Historical Commission.  She runs several social media websites which provide insight, support, and recommendations regarding community and businesses affairs.  She conducts food drives and is a frequent promotor of the city's veterans.

11.    Plaintiff is not a public figure.

12.    Plaintiff has never been convicted of a felony.

13.    Plaintiff has had a stellar reputation in the community.

14.    Plaintiff is a valuable member of and contributor to the good will of the City of Carrollton.

**B.    The Affair**

15.    Plaintiff has been married to Roland Castaneda ("**Roland**") since September 28, 2010.

16.    On or about September 5, 2017, Roland began a romantic relationship with Karen Helget ("**Helget**"), a woman he met at work.

17.    Helget knew Roland was married when she began this romantic relationship.  The affair went on for almost 6 months before Roland ended it.

18.    During the early days of the affair, Helget contacted Plaintiff twice via Facebook wanting to be "friends."  When Helget requested a second time to be "friends" with Plaintiff on

**ORIGINAL COMPLAINT – Page 3**

Facebook, Plaintiff showed Roland the request asking him if he knew who this "Helget" person was. He denied any knowledge of her and then said she was a friend from work who wanted to volunteer for some of the events in Carrollton. During this period of time, Castaneda, received anonymous texts about her husband and *innuendos* about the affair. Plaintiff confronted Roland about her suspicions. He denied the affair.

19.     Plaintiff continued to receive anonymous texts and calls throughout 2018 but ignored them. Plaintiff received confirmation of the affair in December 2018 when she received a call from Helget. Helget informed Plaintiff of the affair, how long it went on and that she was going to take Castaneda's place as wife to Roland and mother to Castaneda's daughter, Evelyn. Plaintiff was rightfully angry, and words were exchanged. Helget hung-up and Plaintiff called her back and left her an incredibly angry voice message. Helget responded by texting Plaintiff a photo of herself and saying this picture was taken when Helget was wearing a shirt that she bought at the store where Plaintiff worked.

20.     Plaintiff confronted her husband about the affair and told him of her conversation with Helget. Plaintiff showed him the text messages and photo. Plaintiff had Roland call Helget back and tell her that the affair was over and that he was not going to leave his wife.

**C.     Plaintiff Tries To File A Complaint Against Helget; Helget Tried to File a Complaint With The Dallas Police Department; The Carrollton Police Department Turns Plaintiff Away Then Gets Involved For Helget**

21.     Unbeknownst to Plaintiff, Helget tried to file a harassment complaint with the Dallas Police Department.

22.     In December 2018, Plaintiff went into Carrollton Police Department and asked to file a police report on Helget. Plaintiff spoke to a Jolene DeVito, the Public Information Officer with the Coppell Police Department, at the time. She said not to file a complaint because it was

not necessary. She further told Plaintiff she would make sure to let the department know not to take a report from Helget. Derrick Miller, the Chief of the Carrollton Police Department at the time, told Plaintiff that asking the department's Public Information Officer is the same as asking him.

23. On or about December 17, 2018, Helget made a formal complaint to the Carrollton Police Department.

24. On or about December 18, 2018, Plaintiff received a call from Detective Chevallier of the Carrollton Police Department concerning the Helget complaint. Plaintiff and Detective Chevallier had a very heated conversation. Words were spoken. Tempers flared. Detective Chevallier said he did not want to hear Plaintiff's side of the story. He cursed at her. The conversation ended abruptly.

25. During this time, Plaintiff also spoke with a Detective Davidson of the Dallas Police Department who informed Plaintiff that the Dallas Police Department would not be pursuing any charges against her as it was essentially a civil matter.

26. Detective Chevallier informed Plaintiff that Helget had approached the Dallas Police Department, but they turned her away because, in their view, the harassment was a civil matter. At this time, and although the Carrollton Police Department said for Plaintiff to not file a complaint, the Carrollton Police Department accepted a sworn complaint from Helget.

27. Detective Chevallier refused to share the complaint with her. He said he merely wanted to inform her about it and tell her to keep away from Helget. Of course, he did not care that Helget was the one who was harassing Plaintiff and she was merely responding to that harassment.

28.    At this time, notwithstanding the fact that Helget had filed a complaint against her, Detective Chevallier informed Plaintiff at the time that the Carrollton Police Department was not formally investigating her.

29.    Plaintiff communicated with Detective Chevallier through the year on occasion. Some communication was by email.  The calls were sometimes quite heated.  Plaintiff had material to give Detective Chevallier and he said he did not want to see it.

30.    As a result of his confrontational style and approach, and the fact that he blind-sided her, she felt the need to defend herself over the telephone.  His ego was apparently so bruised by Plaintiff's vehemence that, as noted herein, Chevallier turned his entire focus on going after Plaintiff.

**D.    Helget's Continued Harassment Of Plaintiff; The False Stalking Charge**

31.    Believing that the affair was over, and that Dallas Police Department's investigation was complete, and no complaint was filed against her, Plaintiff hoped that the emails, texts messages and phone calls would stop.  They did not.

32.    During the affair and up to December 2019, Plaintiff, received numerous emails from Facebook and Google informing her that someone was trying to access her accounts from unknown sources.  Many of these emails indicated that the unknown source was in Carrollton, Texas.

33.    At the time of the affair with Plaintiff's husband was going on, Helget worked for American Tile Company, which is located on 2244 Luna Road, #160, Carrollton, Texas.  American Tile Company is 2 ½ miles from Downtown Carrollton.

34.     The emails from Facebook and Google stopped when Helget filed her charge of stalking against Plaintiff with the Carrollton Police Department on or about December 17, 2018. This charge was completely false.

35.     When Plaintiff began to share with friends and colleagues about the affair and the harassment from Helget, she learned from her colleagues that Helget had been to the store Plaintiff worked at (Ten of Arts), asking for Plaintiff by name and frequented establishments that Plaintiff went to in Downtown Carrollton.

36.     In 2019, Plaintiff started receiving texts messages and Facebook requests from a Sydni Baker. Ms. Baker is a close friend of Helget's. Ms. Baker's text messages and Facebook posts to Plaintiff were harassing and threatening. They caused Plaintiff to become more fearful for her family. Items began to disappear from their home, the wires to their security system were cut, their mailbox was damaged, and dog feces was thrown into their yard and onto their roof.

37.     While all of this was occurring, Plaintiff was dealing with several other personal situations that were adding to her stress. Her ex-husband and father to her two oldest daughters committed suicide, a close friend's daughter died, and a business partner was causing problems on a work project.

38.     She was being banned from attending City of Carrollton functions and entering certain City of Carrollton buildings because people affiliated with the City of Carrollton had heard about the investigation by Dallas Police Department and now, the stalking charge. Helget had made Castaneda's life a living nightmare. What Helget had told Roland when he ended the affair had come to fruition.

39.     Plaintiff never approached Helget, never went to places where she knew Helget would be and never went to Helget's place of business. Unlike Helget, who did go to Plaintiff's

place of employment and to events where she knew Plaintiff would be attending. She went by Plaintiff's home on numerous occasions which caused Roland to keep the kids from playing out in the front yard. If Plaintiff did anything *via* social media or text, it was in response to what Helget, and her friends were doing to her.

**E.      Detective Chevallier**

40.      Unbeknownst to Plaintiff, on or about <u>December 17, 2018</u>, after being turned down by the Dallas Police Department, Helget contacted the Carrollton Police Department to again complain that she was being harassed by Plaintiff. The "case" was assigned to Detective Chevallier.

41.      A year later, on <u>December 11, 2019</u>, Detective Chevallier swore an *Affidavit For Arrest Warrant Or Capias* against Plaintiff stating, under oath, after an investigation, his "belief" that Plaintiff has committed "the offense of STALKING a violation of Section 42.072(b) of the Texas Penal Code, a 3RD DEGREE FELONY." The range of punishment for this offense is 2-10 years in the Texas Department of Corrections.

42.      There is no mention in this affidavit of any attempt by Detective Chevallier to interview Plaintiff as part of his one-sided investigation into Helget's claims of harassment.

43.      In his affidavit, Detective Chevallier says that he "warned" Plaintiff on December 18, 2019, <u>after</u> he swore out his affidavit, to stop her "harassing behavior."

44.      Plaintiff does not deny most of the facts set forth in Chevallier's arrest affidavit. In fact, the affidavit states numerous facts supporting Plaintiff's contention that Helget herself was guilty of harassing Plaintiff. Detective never bothered to gather Plaintiff's side of the story.

45.      Without a doubt, Plaintiff is an emotional and passionate person. She can use colorful language at times, certainly when called to defend her integrity and reputation. Her often-

abrupt approach to the allegations that Helget was harassing her was a reaction to being falsely accused and the fact that Detective Chevallier and the Carrollton Police Department did not appear to care about her side of the story in the least. Having been trained to negotiate and defuse conflicts, he should have known that his behavior was beyond the pale and training for his position.

46. When she heard that Detective Chevallier had signed an arrest warrant affidavit against her, after the fact, Plaintiff was, understandably, stunned. She had no idea that a year-long investigation had been pending against her, let alone the involvement of the Carrollton Police Department. No one from Carrollton Police Department, including Detective Chevallier, had contacted her to interview her to learn her side of what was happening.

47. Plaintiff attempted to inform Detective Chevallier her side of the situation, but he was not interested in hearing what she had to say. Instead, he merely wanted to know if she had any documents to support her side of the story.

48. Plaintiff sent Detective Chevallier affidavits from persons with knowledge of her situation both before and shortly after the date of his affidavit to support an arrest warrant.

49. To Plaintiff's knowledge, Detective Chevallier did not speak to anyone, other than Helget, who had information about this case prior to her indictment. Plaintiff had communications with Detective Chevallier, as did her husband; however, Chevallier was not interested in her side of the story.

50. Detective Chevallier did not speak to Roland after Roland emailed him asking that he speak to him.

51. Detective Chevallier did not subpoena any of Helget's social media accounts like he did with Plaintiff's social media accounts – Facebook, Instagram, YouTube, etc. - and he never

spoke to Detective Davidson of the Dallas Police Department, the first agency that Helget had contacted.

52.     In fact, all of the facts indicate that Detective Chevallier had already made up his mind and filed this case without obtaining all of the facts.  He was clearly acting out of vengeance toward Plaintiff's behavior and indignation of and toward him.

53.     Detective Chevallier chose to believe someone who lied about her relationship with Roland: i.e., that she didn't know he was married (she did), that she was the one who ended the relationship (Roland ended the relationship), that the relationship ended in September 2017 (it ended in Spring of 2018) and continued to harass Plaintiff until the charge was filed.

**F.     The Arrest Warrant**

54.     When Detective Chevallier contacted Plaintiff, he misleadingly informed her that she would be arrested.  At that time, Plaintiff rightly believed she would be arrested.

55.     Based on this, Plaintiff went to the Carrollton Police Department to turn herself in. At that time, she was informed that there was no arrest warrant.

56.     Based on Detective Chevallier's arrest warrant affidavit, Detective Chevallier was ultimately able to get a magistrate to issue an arrest warrant against Plaintiff.

57.     An arrest warrant was issued.

58.     Plaintiff has, directly or indirectly, sought to obtain a copy of the actual arrest warrant but it has not been provided.

59.     Plaintiff voluntarily turned herself into authorities on December 23, 2019.

**G.     The Arrest Of Plaintiff; Overkill; Defamation Of Plaintiff**

60.     The fact of the arrest warrant against Plaintiff and the circumstances involved began to circulate within the City of Carrollton community and beyond.

**ORIGINAL COMPLAINT – Page 10**

61. The facts surrounding the issuance of an arrest warrant are confusing.

62. As a result, Plaintiff was wrongly subject to embarrassment, humiliation, and emotion distress. He had to explain a "he-said-she-said" matter that she had now been subject to arrest for to her family, relatives, and friends.

63. On December 22, 2018, Plaintiff heard a warrant was out for her arrest. She went to the Carrollton Police Department to turn herself in. She was told that there was no warrant for her arrest at that time.

64. To add to the humiliation suffered by and continuing to be suffered by Plaintiff, on December 18, 2019, at 5:17 p.m., Detective Chevallier caused a message to be posted to Plaintiff's Facebook page by Jolene DeVito, an employee of the Carrollton Police Department, public state/wrote, in part, as follows:

> Liz, this is Detective Chevallier. You know that you have an active warrant for your arrest. I have given you the opportunity to turn yourself in and you have not.

There was more to the post, all of which was available to the public on the internet. The post was directed by Chevallier and represented a concerted effort by employees of the City of Carrollton to do anything they could to defame and embarrass Plaintiff, all in violation of their training and experience in such matter.

65. The excessive use of force to arrest of Plaintiff is further demonstrated by the fact that Detective Chevallier and the Carrollton Police Department cause no less than three squad cars and six officers to go to the school attended by Plaintiff's daughter to try and arrest Plaintiff in a very public forum when she came to the school to pick up her daughter.

66. The excessive use of force to arrest Plaintiff is further demonstrated by Detective Chevallier causing members of the Carrollton Police Department and County Marshall to go to the

home of another of Plaintiff's relatives or friend with use of force and SWAT gear to inquire as to the presence of Plaintiff. They entered the home to search it for Plaintiff.

67. The abject failure of Detective Chevallier and the City of Carrollton Police Department to follow reasonable, standard procedures and protocols to gain the arrest of Plaintiff and, in fact, use of excessive force to gain her arrest, is further demonstrated by Detective Chevallier and the Carrollton Police Department sending no less than 5-6 police officers in full SWAT gear with guns draw to Plaintiff's house to arrest her.

68. Again, all of this to gain the arrest of Plaintiff, a lifelong resident of the City of Carrollton, whose whereabout were well known to Detective Chevallier, no emergency was present, no threat to the community existed, and who was alleged to have committed a non-violent crime. Overkill and excessive to say the least.

## H.    The False Narrative and Defamation Grows

69. Carrollton is a small community of about 140,000 citizens. Plaintiff has lived in Carrollton all her life and is well-known in the community. She has many friends and supporters.

70. On October 25, 2022, a meeting of the City Council of the City of Carrollton was convened to, in part, approve reappointment of certain members of the Historical Commission of the City of Carrollton, including Plaintiff. During this meeting, Fleming and Polter, made derogatory and defaming remarks as to Plaintiff, many of which were premised or based on the false criminal harassment complaint sworn out by Helget and Detective Chevallier.

71. The transcript of the City Council meeting at issue provides that the discussion relating to appointments to city commissions were discussed in Executive session and a consensus reach as to voting, yet Councilmen Fleming and , in part:

> Adam Polter: This is a resident [Plaintiff] that has a history of spurious comments and spreading really vicious and defamatory falsehoods about some of the members

up here on the dais, as well as one of our house district representatives. This is a resident…that has managed a Facebook page in the past that appears to have intentionally been named the Carrollton Connection, which was the same name as our newsletter. And also, she routinely used the Carrollton logo or logos without the city's approval, apparently in an attempt to portray the content there as…official content, and therefore misrepresenting the content as official city content. I think, reappointing this person to this Board of Commission puts the city in an awkward and precarious position. I think, given…the person we're talking about, their criminal background of harassment, arrest for harassment...and that was just within the last couple years. I think it is a risk to our brand and our reputation, that we should not endorse. And so, I would like to suggest we appoint…the alternate in her place.

\* \* \*

Councilman Young Sung: The point that the Councilmember Adam Polter is making is about the very, disturbing a little bit for me, about criminal increments of what we're saying. We have constitutional rights. Everyone is…innocent until proven guilty. To making kind of accusation here in front of a chamber is bothersome, right now. Therefore, I want to make a motion to approve this Agenda 28.

Mayor: Okay. I have a motion by Councilmember, Sung, to provide Item Number 28. Councilmember Fleming?

Mayor: We have a motion on the floor.

Richard Fleming: Okay. Thank you, Mr Mayor. I'd like to concur what…

Mayor: I'm sorry. We have a motion on the floor. I need a second.

Richard Fleming: Okay.

Mayor: And you can continue to speak if you'd like to second. If you choose not to second it, then we'll come back to you.

Richard Fleming: Go ahead.

Mayor: Okay? Councilmember Pendleton.

Councilman H. A. Pendleton: Thank you Mr. Mayor. I would second Councilman Young Sung's proposal.

Mayor: Okay. Council, we have a motion by Councilmember Sung and a second by Councilmember Pendleton. Any discussion on the motion?

**ORIGINAL COMPLAINT – Page 13**

Richard Fleming: Yes, sir.

Mayor: Yeah. Just plug in. Oh. I'll cue you in.

Richard Fleming: Thank you, sir.

Mayor: Wait. Just hit the...There you go. Go ahead.

\* \* \*

Richard Fleming: Yes.  I'd like to concur what Mr Councilmember Adam Polter has said. In 2018, I first ran for Carrollton City Council Place Three.  I ran against Pat Cochran.  And during the time period, even at the polls,  I've witnessed the viciousness that is handed out by Liz Kasinyada [sic] at the polls.  The things that she said only to other voters, of which they came and told me, but also things that she told to my church members that were out helping me at the polls.  I didn't know her.  I knew of her, but I didn't know her, personally.  And so, I didn't know why those personal attacks would be coming toward me, other than the fact that I was running against Pat Cochran, who she was going for.  So, I understand that piece. And I've witnessed her viciousness towards other folks that are running for office, state office, congressional office.  And then, this past recently, as you know, I recently ran for the city council seat.  And then, last January I was told by current city council member, Ms. Nancy Cline, that Ms. Liz Kasinyada [sic] said that I called her the C-U-N-T word.

Mayor: Yeah. I'm going to caution the Council from making inflammatory remarks.

Richard Fleming: But that's not inflammatory. That's…

Mayor: [00:06:30] I'm just cautioning council in terms of the…

Richard Fleming: I appreciate the caution, sir, but this is well on record.  And then, as Ms. Cline asked me discussions about that, and I was quite taken aback. Because, Number One, that is not the words that I use in my vocabulary.  And I just don't spend that amount of time.  And so, not only was that, that was also told to my opponent who was running in this election, Miss Nicky Ellis, of which she confirmed to me that that was told.  And so, why would you say something like that, being vicious?  We're just running to serve the community.  I've been serving this community for 20, 25 years.  I didn't just get here.  And those attacks were unwarranted, unwarranted, and just uncalled for, and unprofessional.  And it's real unprofessional when you see that same person that's serving on the board and having all these tight connections, they're still potential legalities in our situation. So, I think the city must be careful with their association with potential bad actors. And I've brought this to you today out in public, so you guys will be aware of that, so there's nothing new if you see anything else in the future regarding the same situation. Thank you Mayor. That is my time.

**ORIGINAL COMPLAINT – Page 14**

Mayor: Thank you. All right. From Robert's Rule of Order, I think we've heard from the speakers. I'm going to call the vote. Okay. The motion passes with Councilmembers Polter and Fleming voting no. All right. With that, Council, that concludes our consent agenda items and our actions. At this stage, we move on to our public forum. This is the opportunity for any citizen or visitor to come before council and speak on any topic that they choose. * * *

72.     The remarks made by Councilman Fleming and Councilman Polter were unnecessarily given because, as the Mayor noted, the issue of the re-appointment of Plaintiff to the Historical Commission was part of the Council's Executive Session and was already resolved.

73.     Councilman Fleming and Councilman Polter, who have a deep-rooted hatred of Plaintiff and are the only Democrats on the City Council, were influenced by and had heard of the allegations against Plaintiff from Chevallier and/or others with the City of Carrollton and were already going to vote no and, with 5 members voting yes, the re-appointment of Plaintiff to the Historical Commission was already decided.

## I.    Plaintiff's Arrest (Voluntary Surrender)

74.     Having been told by Chevallier that a warrant was issued against her, Plaintiff first attempted to surrendered herself to the Carrollton Police Department but was told no warrant was out for her arrest.

75.     Plaintiff then learned, based, in part, on facts set forth herein, that there was, in fact, a warrant issued for her arrest and voluntarily turned herself into the Carrollton Police Department on December 23, 2019.

76.     Plaintiff was placed in the City of Carrollton jail facility and was later transferred to the Dallas County jail facility and formally arraigned on December 23, 2019.

77.     Bail was set at $5,000 and conditions were placed against her which have not been reduced, even though, as noted below, Plaintiff was indicted for the lesser offense of a Class B misdemeanor.  Plaintiff believes and has reason to believe that Chevallier was instrumental in influencing the Magistrate on the issue of the amount and conditions of bail, which included no contact with Helget, submission to random drug testing, and no alcohol consumption.

78.     Plaintiff was humiliated and suffered emotional distress over her arrest.

**J.     The Grand Jury Refuses To Indict Plaintiff For Felony Harassment**

79.     Because she was arrested for a felony offense, the allegations against Plaintiff were required to be presented to the Dallas County Grand Jury.

80.     On or about February 6, 2020, the Dallas County Grand Jury met to consider the criminal allegations against Plaintiff.

81.     Detective Chevallier testified before the Grand Jury.

82.     Plaintiff was not requested to, nor was she asked to testify to the Grand Jury. She obtained counsel, who was permitted to provide a packet of truthful facts and affidavits to the Grand Jury.

83.     To Plaintiff's knowledge, Helget did not ask and was not requested to appear before the Grand Jury.  She did not appear before the Grand Jury.  In fact, to Plaintiff's knowledge, Helget has had no contact with the City of Carrollton, the City of Carrollton Police Department or Detective Chevallier since the time he swore out his arrest warrant affidavit.

84.     Plaintiff does not know what Detective Chevallier may have told the Grand Jury under oath.  However, his three page, single spaced, one-sided, and self-serving arrest warrant affidavit speaks for itself.

85.     After Plaintiff was publicly humiliated by the unlawful and excessive attempts to arrest her, as noted herein, and after Detective Chevallier testified to the Grand Jury, the Grand Jury refused to indict Plaintiff for the felony offense of harassment which carried a potential of 2-10 years in prison; instead, they indicted her for the class B misdemeanor of harassment which carries a maximum penalty of 1 year in jail and a $500 fine.

### First Cause of Action – 42 U.S.C. § 1983
### [City of Carrollton; Detective Chevallier]

86.     Plaintiff realleges and incorporates by reference each of the factual allegations set forth above as if fully set forth herein.

87.     Defendants City of Carrollton, its police department, and Detective Chevallier, are "persons" as that term is defined and used in and under 42 U.S.C. §§ 1983 and 1988.  Detective Chevallier is an authorized agent acting on behalf of the city.

88.     Defendant Chevallier, acting under color of law, subjected Plaintiff to and caused her to be unnecessarily verbally and physically abused and harassed by their actions and conduct described herein.

89.     Defendant the City of Carrollton and its police department's policies and procedures dictate conduct of police officers employed by the City of Carrollton, as well as other city officials, to be other and significantly different that which was confronted by Plaintiff.  These policies and procedure dictate good faith and dignifying conduct on the part of its officers and employees.

90.     Detective Chevallier is assigned to the Criminal Investigative Section of the City of Carrollton's police department.

91.     However, as noted herein, the City of Carrollton, acting through its police department, failed to adequate train its officers and government officials and supervisors to carry out and enforce such policies.

92.     The conduct of Detective Chevallier, acting on behalf of the City of Carrollton and through its police department, was excessive and/or inadequate, as it was directed at Plaintiff, and/or was non-existent.

93.     On information and believe, Detective Chevallier has a history of abuse of members of the public and has not been provided adequate training, supervision, or other tools to prevent such behavior and in investigative techniques.  This resulted in a pattern of abusive conduct and harassment toward Plaintiff in violation of her constitutional and civil rights of free speech and association and to be free from abuse of process at harassment at the hands of government officials and employee, all of which has been exacerbated by the emulation of the conduct, word, and other conduct through members of the Carrollton City Council, members of which are Defendants themselves in this action.

94.     The facts of this action suggest and reveal that Defendants maintained a tacit policy of looking the other way when it came to the physical and/or verbal abuse suffered by Plaintiff at the hands of Detective Chevallier and others who either conspired or condoned his behavior both within and without the Carrollton Police Department.  This policy of indifference was deliberate and flies in the face of the conduct recognized and expected by police officers and thoroughly damaged the dignity and good taste of the Carrollton Police Department and damaged Plaintiff physically and emotionally.

**Second Cause of Action – Negligence (Abuse of Process)**
**[City of Carrollton; Detective Chevallier]**

95.     Plaintiff realleges and incorporates by reference each of the factual allegations set forth above as if fully set forth herein.

96.     The facts of this action demonstrate that Defendants, jointly and/or severally, have committed the tort of abuse of process as it relates to Plaintiff.

97.     In this action, Defendants abused the regular civic and civil processes of the City of Carrollton and the Police Department of the City of Carrollton – interrogation, statements at and outside of council proceedings, etc. – for a purpose not warranted by those processes. These actions, on their face and as corroborated by others, demonstrated, and illustrated a clear pattern of inappropriate and unlawful or unwarranted or unallowed conduct.

98.     For example, Detective Chevallier's conduct toward Plaintiff far exceeded the bounds necessary to interrogate her concerning matter of a criminal investigative nature and officer decency. Fleming and Poulter's conduct toward Plaintiff, both in council proceedings and outside, has demonstrated a clear violation of the process whereby city council members present comments and argument on matters before the council and city. Outside of the council chamber they are still viewed by the public as councilmen and representatives of the City of Carrollton and subject to its civic processes. The conduct exhibited by Fleming and Poulter within and without the city council meeting was egregious and defamatory without any basis in fact.

99.     Plaintiff has been damaged as a proximate cause and result of the conduct and abuses of process of Defendants as noted herein.

100.     **Exemplary Damages**. In addition to the foregoing damages, Plaintiff asserts that the conduct of Defendants, jointly and/or severally, as noted herein and to be proven at trial, was so oppressive, malicious, wanton, grossly reckless so as to warrant the imposition of exemplary

**ORIGINAL COMPLAINT – Page 19**

damages in favor of Plaintiff, Tex. Civ. Prac, & Rem. Code Ann. § 41.003(a), in an amount to be determined by the trier-of-fact.

### Third Cause of Action
### [Civil Conspiracy To Harass and Injure]

101.   Plaintiff realleges and incorporates by reference each of the factual allegations set forth above as if fully set forth herein.

102.   Defendants, directly and through their agents and/or those whom they control, engaged in a pattern of behavior designed and calculated to harass and intimidate Plaintiff.

103.   Federal and state law proscribes the conduct or behavior exhibited by Defendants, as set forth above.

104.   Plaintiff has been damaged as a result of the conspiratorial conduct of the Defendants to deny Plaintiff her right to free speech, association and to be free from harassment and use of excessive force.

105.   **Exemplary Damages**.  In addition to the foregoing damages, Plaintiff asserts that the conduct of Defendants, jointly and/or severally, as noted herein and to be proven at trial, was so oppressive, malicious, wanton, grossly reckless so as to warrant the imposition of exemplary damages in favor of Plaintiff, Tex. Civ. Prac, & Rem. Code Ann. § 41.003(a), in an amount to be determined by the trier-of-fact.

### Fourth Cause of Action -Negligence - Duty of Honest
### Conduct and Services [Detective Chevallier]

106.   Plaintiff realleges and incorporates by reference each of the factual allegations set forth above as if fully set forth herein.

107.   Detective Chevallier is a police officer in the employ of the City of Carrollton.

108.   As a police officer, Detective Chevallier, as well as all police officers employed by

the City of Carrollton, and especially those involved in the matter at bar, owed Plaintiff a duty of honest services.

109.    As noted above, Detective Chevallier, angered by Plaintiff's response to his aggressive and one-side policing and "investigation" into the Helget complaint and allegations, took it up himself to act in a personal and adversarial manner toward Plaintiff in his attempt to see her arrested.   The facts of this action demonstrate a total breach of professionalism and performance of honest services toward Plaintiff.   Plaintiff has been damaged by Detective Chevallier's failure to carry out his duty to perform honest services as he dealt with Plaintiff.  His conduct was intentional, reckless, and unwarranted.

110.    **Exemplary Damages**.  In addition to the foregoing damages, Plaintiff asserts that the conduct of Detective Chevallier, as noted herein and to be proven at trial, was so oppressive, malicious, wanton, grossly reckless so as to warrant the imposition of exemplary damages in favor of Plaintiff, Tex. Civ. Prac, & Rem. Code Ann. § 41.003(a), in an amount to be determined by the trier-of-fact.

## JURY DEMAND

111.        Plaintiff respectfully demands a trial by jury on all claims so triable.

## Request for Relief

Based on the foregoing, Plaintiff respectfully seeks the following:

1.      Judgment against Defendants, jointly and severally;

2.      Actual damages;

3.      Exemplary damages;

4.      Pre-judgment interest;

5.      Post-judgment interest;

**ORIGINAL COMPLAINT – Page 21**

6.    Reasonable and necessary attorneys' fees and expenses;

7.    Costs of court; and

8.    Such other and further relief as the Court deems appropriate under the circumstances.

Dated: December 22, 2022.                 Respectfully submitted,

AKERLY LAW PLLC

By:    */s/ Bruce W. Akerly*
       Bruce W. Akerly
       Texas Bar No. 00953200

2785 Rockbrook Drive, Suite 201
Lewisville, Texas 75067
469-444-1878 telephone
469-444-1801 facsimile
bakerly@akerlylaw.com

ATTORNEYS FOR PLAINTIFF
ELIZABETH CASTANEDA